IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | No. 2:13-cr-00227-JFC-1 |
| v. | ) | |
| | ) | |
| NICHOLAS TROMBETTA, | ) | |
| | ) | Judge Joy Flowers Conti |
| Defendant. | ) | |

DEFENDANT NICHOLAS TROMBETTA'S SUPPLEMENTAL PROPOSED FINDINGS
OF FACT AND CONCLUSIONS OF LAW REGARDING COMMON INTEREST

**I.     INTRODUCTION**

In further support of his Motion to Dismiss or Suppress Evidence Due to Government

Misconduct ("Misconduct Motion") [Docket No. 68] and in response to this Court's May 13,

2015 Order, Defendant Nicholas Trombetta hereby submits these supplemental proposed

findings of fact and conclusions of law.

After a bifurcated evidentiary hearing on the Misconduct Motion at which the Court

directed the parties to "first address only whether any attorney-client privilege has been

established" (Sept. 29, 2014 Order), the parties submitted their respective proposed findings of

fact and conclusions of law on that threshold issue.  Those submissions focused on whether

Trombetta had personal attorney-client relationships with four different lawyers who were

involved in conversations that were surreptitiously recorded by the government.  Thereafter, on

May 13, 2015, the Court directed the parties to submit supplemental proposed findings of fact

and conclusions of law addressing whether the common interest privilege applied to the

conversations involving the four lawyers.

The common interest privilege protects the confidentiality of communications among separately represented parties that share a common legal interest.  In connection with the matters currently before the Court, the common interest privilege would come into play, if at all, only after determinations are made regarding the threshold attorney-client relationship issue.

- If the Court were to find that Trombetta had attorney-client relationships with all four of the lawyers, then the recorded conversations involving any combination of those lawyers would be protected by Trombetta's attorney-client privilege with them.  In that case, the Court would not need to reach the common interest privilege.

- If the Court were to find that one or more, but not all, of the lawyers at issue represented Trombetta personally, the recorded conversations involving Trombetta lawyer(s) and lawyer(s) representing another party must then be examined to determine whether the conversations remain privileged.  In that case, the common interest privilege would be relevant.

Trombetta respectfully maintains that the record establishes his personal attorney-client relationships with the lawyers at issue.  The Court's order with respect to supplemental findings of fact and conclusions of law, however, requires Trombetta to address the second scenario, where only a subset of the lawyers at issue represented Trombetta personally, before the threshold issue regarding his personal attorney-client relationships is decided by the Court. Without waiving his position on that threshold issue and in compliance with the Court's direction that the common interest issue be addressed now, Trombetta hereby submits his proposed findings of fact and conclusions of law addressing common interest.

As explained below, the evidence establishes that the common interest privilege protects the conversations at issue from disclosure to third parties and intrusions by the government.

## II.    SUPPLEMENTAL PROPOSED FINDINGS OF FACT[1]

While Trombetta contends that the evidence at the first phase of the hearing demonstrates that Attorneys Barry, Askar, Monico and Daly were representing him personally on issues that affected his rights, in the alternative the evidence demonstrates coordinated action and confidential communications among the lawyers with respect to matters of common legal interest to their respective clients.

61.    The lawyers were working together closely, as a team.  Askar, in a conversation with Monico and Daly that was recorded by Geibel, spoke about making Monico and Daly the "quarterback" with respect to portions of the team's efforts.  Def.'s Ex. A3 (Feb. 20, 2012 1D8, A3-Tr. at 21).  Neither Monico nor Daly expressed any disagreement.

62.    During a March 8, 2012 meeting among Barry, Askar, Daly and Trombetta that was recorded by Geibel, Askar reminded the group:  "we're all speaking here confidentially." Def.'s Ex. A6a (Mar. 8, 2012 1D15 (Part 1), A6-Tr at 57).  No participant in the conversation ever voiced any disagreement with Askar's reminder, and the group thereafter continued its confidential communications.  *See generally* Govt. Ex. 30A-2.

63.    Other communications among the group during the March 8, 2012 recorded conversation are consistent with and further demonstrate that the lawyers were working together on matters of common interest.  For example:

a.    The lawyers discussed sharing instructive case law among the group. Def.'s Ex. A6h (Mar. 8, 2012 1D15 (Part 2), A6-Tr. at 1-2).

---

[1] Defendant's Exhibits are referred to as Def.'s Ex. __.  Audio evidence will also be identified by date and a unique number (1D__ for recordings made by the government's informants, and a five digit number for Title III interceptions), followed by the pages from the transcripts prepared and offered at the hearing as listening aids. Transcripts from the hearing will be identified by date, page number and witness.  Because the proposed findings of fact herein supplement and should be read together with proposed findings of fact 1-60 previously submitted to the Court, these supplemental proposed findings of fact will begin with the next sequential number, 61.

b.      Barry stated that "we have as a group collectively have sought opinions from McGuire Woods."   Def.'s Ex. A6b (Mar. 8, 2012 1D15 (Part 2), A6-Tr. at 14).

c.      Barry told Trombetta that "I don't know what the answer to that is.  But I think that you know you have started with getting Leo [Daly] and Joe [Askar] and I together with you." Def.'s Ex. A6d (Mar. 8, 2012 ID15 (Part 2), A6-Tr. at 20.

d.      Barry stated that he, "with Joe [Askar] and Leo [Daly] and Ralph [Monico] are working on …" Def.'s Ex. A6k (Mar. 8, 2012 1D15 (Part 2), A6-Tr. at 21.

64.      All participants in the March 8, 2012 meeting had a common interest in Trombetta's transition from PA Cyber and potential future relationship with PA Cyber and its downstream vendors in a way that complied with all legal restrictions – an issue that was related to the potential sale of Lincoln Interactive curriculum owned by NNDS and used by PA Cyber. To that end:

a.      The group specifically discussed legal issues raised by the lawyers, including tax issues and potential scrutiny by the Pennsylvania Attorney General of the transactions that the group was considering .  Govt. Ex. A-1 at 6-19.

b.      Askar commented: "if you're going to start up a separate entity . . . maybe that separate entity is going to be the entity that creates a [new curriculum]."  Govt. Ex. 30A-2 at 34:16-20. Barry then responded: "… at this point, I think we're just trying to get a plan." *Id*. at 35:13-14.

c.      Geibel also stated: "[T]here's not a whole lot of change I think I can make at Avanti, you know, until you figure out where you're going."  Govt. Ex. 30A-2 at 37:16-18.

d.      Geibel asked: "So you think that this doesn't necessarily have to impact the plan that you had in place about leaving at the end of May and—" Govt. Ex. 30A-2 at 32:22-24.  Trombetta responded "I have to wait and see.  We'll talk it through.  Okay?" *Id*. at 32:25-33:1.  "Talk it through" is exactly what they did during the March 8, 2012 recorded conversation and thereafter.

e.      Trombetta stated that he was "glad that we're framing going forward in a way that is fair to [sic] make sense whether to do it the right way." Govt. Ex. 30A-2 at 29:19-30:6.

f.      Barry made clear that the discussion of curriculum sales is something that he needed to factor into his personal advice to Trombetta, when he stated: "I learned some more things today that really were not part of my thought process … so therefore I know I need to deal with it." Govt. Ex. 30A-2 at 57:11-15.

g.      Barry also stated: "we could figure out an interim game plan and then, you know, that would free Nick up to do a lot of different things in whatever capacity when he's on the other side." Govt. Ex. 30A-2 at 31:22-25.

h.      Barry summarized for the group his advice to Trombetta that he should transition to the private sector, which Barry said "is consistent with what we are talking about here today." Govt. Ex. 30A-2 at 37:2-11.

i.      The group specifically discussed whether Trombetta could be an employee of Avanti, to which Trombetta stated that he would need approval from his counsel. Govt. Ex. 30A-2 at 56:10-15.  The recorded discussion includes confidential legal advice from Barry to Trombetta in that regard.  *Id*. at 59:1-19.

65.      Coordinated team efforts continued after March 8, 2012.   Monico testified that his colleague Daly attended other meetings in 2012 with Barry and Trombetta.  11/25/14 Tr. at 93-94 (Monico).

66.      Other recorded conversations indicate that there was a follow-up meeting in mid-March 2012 among Barry, Daly and Askar that was not recorded by the government's informant. *See* Def.'s Ex. A7a (Mar. 12, 2012 1D17, A7-Tr at 20-21) (Askar: "[T]hat's what I want to tell Leo today. Thursday or Friday when we meet with Doc, I want to have a heart-to-heart with Doc"); Def.'s Ex. A7b (Mar. 12, 2012  1D17), A7-Tr at 24) (Geibel: "He [Trombetta] said, you know what, we're going to be talking about exit strategy so don't bother going to Tim Barry's this coming Friday.  He said he's going to be working on stuff with Tim.").

67.      In a call between Trombetta and Askar that the government intercepted, Trombetta sought assurances from Askar that he was coordinating his efforts with Barry.  Def.'s Ex. A23 (Synopsis of July 2, 2012 Title III Interception 09705) at 2.  Askar made it clear that he was doing so.  *Id.* ("Tim Barry and I had a lengthy discussion about it Friday").

68.      NNDS lawyers consulted with Geibel regarding NNDS-related issues.   For example:

      a.      Brett Geibel attended and participated in a February 20, 2012 meeting with Askar, Daly and Monico in which they discussed legal issues regarding the potential sale of certain NNDS assets.  Def.'s Ex. A3 (Feb. 20, 2012 1D8, A3-Tr).

      b.      Brett Geibel attended and participated in a March 7, 2012 meeting with Askar, during which they discussed legal advice that Daly and Monico had provided regarding the sale of NNDS assets.  Def.'s Ex. A4 (Mar. 7, 2012 1D13, A4-Tr.).

69.     Brett Geibel attended and participated in the NNDS Board of Directors meeting that was held on March 8, 2012.  Govt Ex. 30A-1.[2]  *See also* 11/10/14 Tr. at 131-32 (Barry testifying that there had been a NNDS Board meeting on March 8, 2012, prior to his meeting with Askar, Daly, Trombetta and Geibel).

## III.    SUPPLEMENTAL PROPOSED CONCLUSIONS OF LAW

### A.    The Common Interest Privilege

The common interest privilege[3] allows "persons who have common interests to coordinate their positions without destroying the privileged status of their communications with their lawyers."  Restatement (Third) of the Law Governing Lawyers § 76, cmt. b. (2000) (hereinafter "Restatement").  It is an exception to the rule that disclosure to third parties waives whatever privilege attaches to an underlying communication.

The Restatement summarizes the common interest privilege as follows:

> If two or more clients with a common interest in a litigated or nonlitigated matter are represented by separate lawyers and they agree to exchange information concerning the matter, a communication of any such client that otherwise qualifies as privileged…that relates to the matter is privileged against third persons.  Any such client may invoke the privilege, unless it has been waived by the client who made the communication.

---

[2] Geibel made four recordings on March 8, 2012.  The first recording is identified as 1D15 (part one).  The other four recordings are identified as ID15 (part two), 1D15 (part three) and 1D15 (part four).  Govt Ex. 30A-1 is a ID15 (part one).  Govt Ex. 30A-1 begins with an NNDS Board meeting in which Geibel and participated, and continues with a separate meeting among Barry, Askar, Daly and Trombetta that took place after the NNDS Board meeting.  However, the transcript that the government offered as a listening aid did not include the entirety of Govt Ex. 30A-1.  Specifically, it transcribed only the separate meeting that took place after the NNDS Board meeting was concluded, and omitted the NNDS Board meeting that preceded it.  In this supplemental proposed finding of fact, we cite to Govt Ex. 30A-1 for the sole purpose of establishing that Geibel attended the NNDS Board meeting.  If the Court wishes to receive a transcript of the recording of the Board meeting, we will prepare one.

[3] The common interest privilege is alternatively referred to as the common interest doctrine, the community of interest privilege and the joint defense privilege.  *See In re Teleglobe*, 493 F.3d at 363-64.

Restatement § 76(1).  This concise formulation has been cited approvingly by the Third Circuit.
*See In re Teleglobe Comm'n Corp.*, 493 F.3d 345 (3d Cir. 2007) (referencing the Restatement
extensively in its analysis of various evidentiary privileges).

Analysis of the common interest privilege can generally be broken into five elements:  (1)
parties represented by separate counsel, (2) in a litigated or nonlitigated matter, (3) share a
common legal interest, (4) agree to exchange information related to that matter, (5) in a manner
that would otherwise qualify as privileged.  *See* Restatement § 76, *accord In re Teleglobe*, 493
F.3d at 363-67.  The evidence satisfies each of these elements.

### B.       The Common Interest Privilege Applies to the Conversations at Issue.

#### 1.       "[T]wo or more clients…represented by separate lawyers…"

The first element of the common interest privilege is that there be two or more clients
represented by separate counsel.  *See* Restatement § 76(1); *In re Teleglobe*, 493 F.3d at 363-64.[4]
Here, Barry, Askar, Monico, and Daly are all attorneys.  While the Court has yet to rule on the
threshold issue of whether Trombetta had a personal attorney-client relationship with each of
them, the record reflects that each also had a corporate client (Barry represented PA Cyber;
Askar, Monico and Daly represented NNDS).  PFF 19, 31, 51.  If the Court were to find that one
or more of these attorneys did not represent Trombetta personally, then the conversations among
them would be conversations among attorneys for "two or more clients…represented by separate
lawyers."  *See* Restatement § 76(1); *In re Teleglobe*, 493 F.3d at 363-64.

#### 2.       "[I]n a litigated or nonlitigated matter…"

The second part of the Restatement's articulation of the common interest privilege is not
a separate requirement, but rather a clarification.  *See* Restatement § 76, Reporter's Note cmt. b

---

[4] Circumstances in which co-clients share the same attorney or multiple attorneys represent the same client are
evaluated differently.  *See generally In re Teleglobe*, 493 F.3d 345 (analyzing the various privilege doctrines).

(explaining that "common interest" does not require either active or pending litigation); *In re Teleglobe*, 493 F.3d at 364 (commenting on the evolution of the "common interest" privilege from the older "joint-defense privilege" and noting that the common interest privilege can protect communications "even in purely transactional contexts."). It stems from the fact that the predecessor "joint-defense" privilege was occasionally interpreted as being applicable only during or under the imminent threat of litigation in which the parties to the "joint-defense" were also named parties to the litigation. *See* Restatement § 76, Reporter's Note cmt. b. The Third Circuit has explicitly rejected that potential interpretation of the common interest privilege. *See In re Teleglobe*, 493 F.3d at 364.

Accordingly, it is immaterial whether or not Trombetta and the various attorneys and parties to the conversations were contemplating litigation because active, imminent, or even potential litigation is not required in order to maintain the confidentiality of conversations pursuant to the common interest privilege.

### 3.    "[W]ith a common interest…"

To fall under the protection of the common interest privilege, communicating parties must share a "common interest." *See* Restatement § 76(1). This shared interest must be "at least a substantially similar legal interest." *See In re Teleglobe*, 493 F.3d at 365. The parties need not possess complete identity of legal interests. *See* Paul R. Rice et al., 1 *Attorney-Client Privilege in the United States* § 4:35 (2014); *In re Teleglobe*, 493 F.3d at 366 (contrasting co-client privilege, which requires nearly identical interests, with common interest privilege and noting that the latter "can afford to relax the degree to which clients' interests must converge" because such arrangements do not create conflicts for the attorneys). Indeed, the interest of the parties to a common interest privilege can be *adverse* in some respects. *Eisenberg v. Gagnon*, 766 F.2d

770, 787-88 (3d Cir. 1985).  Examples of parties that are adverse in some respects yet still can enjoy a common interest privilege against third parties include buyers and sellers in corporate transactions and separate entities in mergers.  *See La. Mun. Police Employees Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 310 (D.N.J. 2008).

The shared interest and the communications related to it need not be *exclusively* legal in nature.  *See King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, Civ. A. No. 2:06-cv-1797, 2011 WL 2623306 n.4 (E.D. Pa. July 5, 2011) ("[P]rivilege may apply even where communications included discussion of various business considerations, as long as the communication was infused with legal concerns.").  This is the same standard that various courts in this Circuit have interpreted to evaluate communications with in-house counsel.  *See id.* at *3 (collecting cases). Discussions of business concerns are legal in nature if the purpose of those discussions is "securing legal not business advice."  *Pa. Transp. Auth. v. Caremarkpcs Health, L.P.*, 254 F.R.D. 253, 259 (E.D. Pa. 2008) (collecting cases) (internal quotation marks omitted).  The Third Circuit has held that "[e]ven if [a] decision was driven…principally by profit and loss, economics, marketing, public relations, or the like, [but] was also infused with legal concerns, and was reached only after securing legal advice" documentation memorializing that decision would be protected from discovery by the attorney client privilege.  *See In re Ford Motor Co.*, 110 F.3d 954, 966 (3d Cir. 1997) (holding that board minutes which captured what could "ultimate[ly]…be characterized as a business decision" were protected from discovery because the minutes would have also revealed legal advice) *abrogated in part on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009).[5]

---

[5] *In re Ford* also held that adverse privilege decisions qualified for immediate appeal under the collateral order doctrine.  *See id*.  This issue created a circuit split that the Supreme Court resolved in *Mohawk.  See* 558 U.S. 100. The *Mohawk* opinion took no position on *Ford*'s characterization of legal advice.

All participants in the March 8, 2012 meeting had an interest in Trombetta's transition from PA Cyber and potential future relationship with PA Cyber and its downstream vendors in a way that complied with all legal restrictions, and that common legal interest was related to the potential sale of Lincoln Interactive curriculum owned by NNDS and used by PA Cyber.  *See* PFF 64a-64i.   Such common legal interests are analogous to issues that federal courts have already recognized as satisfying a common legal interest:  contract negotiation and interpretation questions (*Pa. Transp. Auth.*, 254 F.R.D. at 260 and *Andritz Sprout-Bauer, Inc. v. Beazer East, Inc.*, 174 F.R.D. 609, 633 (M.D. Pa. 1997));   analyzing the litigation risks associated with acquiring a new business (*Sealed Air Corp.*, 253 F.R.D. at 308); and intellectual property rights (*King Drug*, 2011 WL 2623306 at *3).   Furthermore, the parties' discussions also included concerns about potential tax and regulatory issues.  *See* PFF 64a.  Thus, the shared legal interests in Trombetta's transition from PA Cyber and the sale of Lincoln Interactive did not simply arise out of a vague desire to avoid litigation, but rather were "business decisions [that] were only being made after securing legal advice."  *See Pa. Transp. Auth.*, 254 F.R.D. at 260.

### 4.      "[A]gree to exchange information…"

Parties to the common interest privilege must "agree to exchange" information concerning the common interest.  *See* Restatement § 76(1).  However, such agreement need not be formal or memorialized in writing.  *See* Rice § 4:35 n. 13 (collecting cases from within the Third Circuit).  The "common interest privilege [does not] require a written joint strategy." *In re Nat'l Medical Imaging LLC*, No. 05-12714DWS, 2005 WL 3299712 at *5 (Bankr. E.D. Pa. Oct. 31, 2005); *Sig Swiss Indus. Co. v. Fres-Co Sys., USA, Inc.*, Civ. A. No. 91-0699, 1993 U.S. Dist. LEXIS 3576 at *7 (E.D. Pa. Mar. 17, 1993) ("This Circuit has enumerated no requirement that there be a written agreement between entities before they may be said to be engaged in a

[common interest].").   Courts in this Circuit have even found the common interest privilege protected communications where a party to a written privilege agreement *explicitly violated that agreement*, because the court would "not ignore the obvious fact that [the parties] had a common interest."  *See In re Nat'l Medical* at *5.

The importance of the attorney-client privilege is such that "the courts must, within their limits, guard it jealously."  *Klitzman, Klitzman & Gallagher v. Krut*, 744 F.2d 955, 960 (3d Cir. 1984) (internal quotation marks omitted).   Moreover, application of the privilege must be "predicable and certain."  *See Rhone-Poulenc Rorer Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1994) ("An uncertain privilege – or one which purports to be certain, but rests in widely varying application by the courts – is little better than no privilege." (internal quotation marks omitted)).   As such, it is important that parties be able to predictably rely on oral expressions of confidentiality.

Here, the conduct of the attorneys conclusively demonstrates that they agreed to exchange confidential information concerning matters of common interest.   Indeed, there could be no clearer expression than the statement made by Askar that "we're all speaking confidentially here."  PFF 62.  The manner in which this statement was made, and the manner in which the lawyers proceeded, reflects that Askar was reminding the participants of the common interest of which they were already aware.  If a party to the conversation did not intend their conversations to be protected by the common interest privilege, he would have said so.  But that did not occur.  Furthermore, if this were the first time that the parties had considered whether their communications would be confidential, one would expect some, if not extended, discussion about that.  But that did not occur either.  Indeed, there was no discussion at all.  Rather, the parties quickly moved on and continued their confidential discussions of matters about which

they shared a common interest.  In short, Askar's statement was a short-hand invocation of the common interest privilege and acknowledgement of the parties' agreement, and all parties indicated – though their conduct – their continued consent to proceed with their coordinated efforts pursuant to the common interest privilege.

### 5.    "[A] communication of any such client that otherwise qualifies as privileged…"

Finally, a communication is protected by the common interest privilege if it would "otherwise qualify as privileged."  *See* Restatement § 76(1).  That is, the communication must be made between privileged persons in confidence for the purpose of obtaining or providing legal assistance for the client.  *See In re Teleglobe*, 493 F.3d at 359 (quoting Restatement § 68).

As noted above, the communications among the lawyers were clearly intended to be kept confidential from those outside the scope of the common interest, and were made in connection with matters of common legal interests.  By their conduct, the lawyers demonstrated that they were confident in their ability to exchange information without damaging their client's ability to claim a privilege for that information later.  The presence of Brett Geibel during conversations involving these lawyers does not change this common interest privilege analysis.

First, the "persons" who may share legal communications without waiving privilege include any member of the "client set" which includes "a client, *the client's agent for communication*, the client's lawyers, and the lawyer's agent."  *See* Restatement § 76, cmt. d, § 70 (emphasis added); *see also PennEnvironment v. PPG Indus., Inc.*, Civ. A. No. 12-342, 2013 WL 6147674 at *4 (W.D. Pa. Nov. 22, 2013) (citing with approval the Restatement's definition of "privileged persons.").  Agents and representatives of a client, even when not employees of that client, can avail themselves of the attorney-client privilege.  *See In re Flonase Antitrust Litig.*, 879 F. Supp.2d 454, 459-460 (E.D. Pa. 2012) ("To apply a narrow construction of the privilege

to communications involving independent consultants would be too restrictive to be realistic.")
(internal quotation marks omitted); *In re Bieter Co.*, 16 F.3d 929, 936-40 (8th Cir. 1994). In
*Flonase*, the district court emphasized that the spirit of *Upjohn* required extending attorney-client
privilege to non-employee representatives of clients where those communications "were kept
confidential and made for the purpose of obtaining or providing legal advice." *See In re
Flonase*, 879 F. Supp.2d at 459-60.

Brett Geibel's participated in the conversations as a representative of NNDS, and thus as
a client of the NNDS lawyers who participated in those conversations. And like the client
representative in *Flonase*, Geibel was "an integrated member of the…team." *See id*. at 460. He
attended board meetings (PFF 69), was included and included himself in communications with
NNDS counsel that addressed common legal interests between NNDS and Trombetta (PFF 68),
and was aware of the intention and understanding, shared by all the parties to those
communications (save for Geibel's own *silent* deception), that they be kept confidential (PFF
62). At no time did Geibel express an unwillingness to keep those communications confidential.
It would stretch credulity to believe that NNDS lawyers would consult with Geibel and have him
participate in board meetings if it did not expect that their confidential communications with him
would remain confidential. "There is no reason to differentiate between [employees of a client]
and [regularly present outsiders] when both occupy extremely sensitive and continuing [roles for
the client]: both possess information of equal importance to the lawyer." John E. Sexton, *A
Post-Upjohn Consideration of the Corporate Attorney-Client Privilege*, 57 N.Y.U. L. Rev. 443,
498 (1982).

Second, the fact that the government sent its informant to record conversations among
Trombetta and the lawyers that all other participants considered to be confidential is of no

consequence to the legal analysis, as Geibel's deception does not constitute a knowing waiver of confidentiality by Trombetta or the separately-represented entities that participated through their counsel. Confidentiality is waived by a disclosure that "signals that the client does not intend to keep the communication secret" not by active deception by an otherwise-privileged person. *Compare In re Teleglobe*, 493 F.3d at 361 *with United States v. Valencia*, 541 F.2d 618, 623 (6th Cir. 1976) (holding that "it was improper for the government to have intruded into an attorney-client relationship by paying an attorney's secretary for information about his clients," and finding taint).

Finally, the participation of the government's informant in certain conversations involving the lawyers goes to the issue of misconduct that the Court reserved for the second phase of its consideration of the Misconduct Motion. The government knew that Geibel came into regular contact with the attorneys. Nevertheless, it dispatched him to elicit conversations with Trombetta about lawyers and with lawyers about their advice to Trombetta. Once dispatched, Geibel specifically asked Trombetta about advice he received from lawyers and asked the lawyers about advice they gave Trombetta. *See* Reply to Government's Response to Misconduct Motion [Docket No. 93] at 17-19. Evidence of the government's knowing and purposeful misconduct began to emerge at the first phase of the hearing. For example, the testimony of Special Agent Bell demonstrates that the government knew in advance when its informants would be recording lawyers, authorized the recording nonetheless, listened to the recordings shortly after they were made and even discussed the contents of the recordings with the prosecutors, yet no one on the government team ever once told the informants to stop recording lawyers. *See* 9/30/14 Tr. at 110-12, 125-28 (SA Bell). In the face of such conduct (and further such evidence to be developed in the second phase of the hearing), it would be an

unfair and unjust manipulation of the waiver doctrine if the government were able now to excuse its misconduct by relying on the very recordings that are its fruits.  That is why any issues regarding the participation of the government's informant in the conversations at issue should be reserved for the misconduct phase, (a) after determinations are made regarding attorney-client relationships and, if necessary, the applicability of the common interest privilege, and (b) with the benefit of factual development regarding the conduct of the government during the next phase of the hearing.

## IV.    CONCLUSION

On the threshold issue before the Court, Trombetta respectfully submits that the Court should find that Trombetta had a personal attorney-client relationships with Attorneys Barry, Askar, Daly and Monico.  In the alternative, and for the reasons set forth herein, the Court should find that the common interest privilege protected the communications at issue from further disclosure and intrusions by the government.  Either way, the Court should proceed to the next phase of the hearing, which will focus on the government's intentional and purposeful recording of privileged conversations and the extent to which the taint from that misconduct requires suppression of evidence or dismissal of the indictment.

Respectfully submitted,

/s/ Robert A. Salerno
Adam S. Hoffinger, DC 431711
Robert A. Salerno, DC 430464
Schulte Roth & Zabel LLP
1152 15th Street, N.W.
Washington, D.C.  20005
Telephone: (202) 720-7470
Facsimile: (202) 730-4520
adam.hoffinger@srz.com
robert.salerno@srz.com

*Counsel for Defendant Nicholas Trombetta*

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | No. 2:13-cr-00227-JFC-1 |
| v. | ) | |
| | ) | |
| NICHOLAS TROMBETTA, | ) | |
| | ) | Judge Joy Flowers Conti |
| Defendant. | ) | |

**CERTIFICATE OF SERVICE**

I, Robert A. Salerno, counsel for Defendant Nicholas Trombetta, hereby certify that I caused a copy of the foregoing by causing a copy to be electronically filed with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to all parties of record.

/s/ Robert A. Salerno
Robert A. Salerno
*Counsel for Defendant Nicholas Trombetta*

Dated:  May 29, 2015