**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | No. 2:13-cr-00227-JFC-1 |
| v. | ) | |
| | ) | |
| NICHOLAS TROMBETTA, | ) | |
| | ) | |
| | ) | Judge Joy Flowers Conti |
| Defendant. | ) | |

### DEFENDANT NICHOLAS TROMBETTA'S MOTION FOR SEVERANCE

The right of a defendant to confront the witnesses against him in a criminal case is enshrined in the Confrontation Clause of the Sixth Amendment to the United States Constitution. Defendant, Nicholas Trombetta, recently obtained from the government notes and memoranda prepared by an Internal Revenue Service ("IRS") special agent that purport to memorialize statements made by Trombetta's co-defendant, Neil Prence.  If the government uses Prence's statements at a joint trial and Prence does not testify, such use would violate Trombetta's rights under the Confrontation Clause and could not be cured by an instruction to the jury.  *See United States v. Bruton*, 391 U.S. 123 (1968).  Accordingly, unless the government commits that it will not make any use of Prence's statements in a joint trial and the Court so orders, the trial of the charges against Trombetta should be severed from the trial of the charges against Prence.  It is in the interest of judicial economy that this *Bruton* be issue resolved now; waiting until trial to resolve it could result in a mistrial.  For these reasons, Trombetta brings the instant motion.

## BACKGROUND

**A.     The Indictment**

The indictment charges Prence and Trombetta with a tax conspiracy pursuant to 18 U.S.C. § 371.  It also charges Trombetta with substantive tax counts under 26 U.S.C. § 7206(1) and fraud counts under 18 U.S.C. § 1341 and 18 U.S.C. § 666(a)(1)(B).

The indictment alleges, among other things:

- Trombetta effectively controlled the management and operation of an entity known as National Network of Digital Schools Management Foundation ("NNDS"), a non-profit entity that had a management contract with the Pennsylvania Cyber Charter School ("PA Cyber"), an online charter school founded by Trombetta.  Indictment ¶¶ 1, 4.

- Trombetta founded and effectively controlled the Avanti Management Group ("Avanti" or "AMG"), a for-profit company that provided management services to NNDS.  *Id.* at ¶¶ 5, 6

- The object to the alleged conspiracy between Prence and Trombetta was to conceal the true nature, source and amount of income to Trombetta. *Id.* at ¶ 51.

- It was a part of the alleged conspiracy that through management contracts between PA Cyber and NNDS, and between NNDS and Avanti, Trombetta created a revenue stream that started at PA Cyber and flowed through to Avanti.  *Id.* at ¶ 56.

- It was a part of the alleged conspiracy that Trombetta selected four straw owners of Avanti to be put in place to hold and manage assets for him until an unspecified future time when Trombetta would assume ownership of Avanti, by causing the straw owners to relinquish a substantial portion of their ownership interests to him, leaving him with a controlling interest in Avanti. *Id.* at ¶ 55

- It was a part of the alleged conspiracy that Trombetta created a company named One2One, had his sister, Elaine Trombetta Neill, become the owner/operator of One2One, and had Avanti issue checks to One2One.  *Id.* at ¶¶ 53, 58.

- It was part of the alleged conspiracy that Trombetta had access to and use of the funds of both Avanti and One2One and caused them to enter into transactions that were of personal benefit to Trombetta and his family members and friends.  *Id.* at ¶ 57.

2

- It was a part of the alleged conspiracy that Prence prepared income tax returns for Trombetta that understated his income. *Id.* at ¶ 66.

- It was a part of the alleged conspiracy that Prence prepared income tax returns for the straw owners of Avanti that reported income to them that should have been reported on Trombetta's income tax returns. *Id.* at ¶¶ 64, 67.

- It was part of the conspiracy that Prence prepared income tax returns for Elaine Trombetta Neil that should have been reported on Trombetta's income tax returns. *Id.* at ¶¶ 61, 67.

## B.   The Statements of Co-Defendant Prence

Trombetta made multiple requests for production of statements by his co-defendant Prence. After multiple refusals, the government finally produced the statements to Trombetta on May 21, 2015. It produced four memoranda prepared by Internal Revenue Service Special Agent Kevin O'Donnell of meetings with Prence that took place between July 12, 2012 and November 20, 2013. Some of the memoranda were drafted long after the meetings they purport to document. For example, the memorandum of the government's November 20, 2013 meeting with Prence was drafted over 17 months later, on April 26, 2015. The memorandum of the government's May 9, 2013 meeting with Prence was drafted over 16 months later, on September 26, 2014. The date on which the memorandum of the government's July 12, 2012 meeting with Prence was drafted was redacted. Two of the four memoranda[1] contain statements that the government presumably wishes to use in the joint trial of the charges against Prence and

---

[1] The memoranda of the government's July 13, 2012 and November 20, 2013 meetings with Prence do not contain any inculpatory statements by Prence. To the contrary, they contain clearly exculpatory information, including statements by Prence that the shareholders of Avanti were the company's true owners and had access to the company's money any time they wanted it; and that attorneys had created Avanti and reviewed and approved the management agreement between NNDS and Avanti. However, both memoranda also contain other statements regarding the government's assessment of the case, including commentary by the IRS special agent regarding what Prence "was referring to" when he made certain statements. It also includes a statement that the government agents told Prence regarding its belief that "[Prence] is part of a scheme to assist Nick Trombetta in falsely reporting the income of Avanti which he knew to be Trombetta's on the returns of the shareholders who were acting as straw parties for Trombetta." For those reasons, the memoranda are inadmissible on grounds unrelated to *Bruton*, and Trombetta reserves his rights to challenge their admissibility if the government attempts to use them at trial.

Trombetta.[2]

1.    The Government's July 12, 2012 Interview of Prence

This memorandum contains repeated statements by Prence that Trombetta had not done anything wrong, that the attorneys had cleared the formation of Avanti with the four owners, and that Trombetta was a "wonderful man." [3]   However, according to the IRS agent who drafted the memorandum, Prence also made certain statements that could be used to inculpate Trombetta.

Among other things, the memorandum states: Prence was involved in the formation of Avanti; Prence met with Trombetta and the four owners regarding the formation of Avanti; the intention of the four owners of Avanti was to turn the company over to Trombetta; Trombetta received financial information regarding Avanti; Trombetta was the founder of NNDS and had control over the NNDS contract with Avanti; Prence was at a Florida condominium owned by Avanti with Trombetta and the Avanti shareholders; Trombetta met with Florida officials at the Florida condominium; Prence provided numerous details regarding the finances of One2One and its accounting practices; PA Cyber, Avanti and NNDS are the same group of people; and Prence prepared tax returns for Trombetta, the Avanti owners, and Elaine Neill.

Significantly, Trombetta's name is mentioned *52 times* in the six-page memorandum. Entities that Trombetta is alleged to have controlled are mentioned *62 times*.

---

[2] By making this motion, Trombetta does not admit to the accuracy of the memoranda or the statements that the IRS special agent claims Prence made.  If Prence were to testify, he would be subject to cross-examination on both the statements in the memorandum and the underlying facts.

[3] Because the memoranda of the July 12, 2012 interview and May 9, 2013 proffer session contain numerous exculpatory statements, they should have been produced "at the time of the arraignment" pursuant to the government's obligations under Local Rule of Criminal Procedure 16C.  They were not produced at that time.  They also should have been produced pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.  However, they were not included when the government made a production of *Brady* exculpatory materials.  Trombetta has filed a separate motion for an order regarding disclosure of exculpatory evidence.

2.      The Government's May 9, 2013 Proffer Session with Prence

Prence was subsequently interviewed by five government agents and Assistant United States Attorney James Wilson on May 9, 2013, pursuant to a proffer agreement between the government and Prence.  The memorandum of the interview was prepared over 16 months later, on September 26, 2014, by IRS Special Agent O'Donnell.  The proffer letter is not attached to the memorandum and the government did not produce it to Trombetta.  However, the standard proffer letters in this district usually state that the government can use information obtained in the proffer session against the declarant at trial "if the witness should subsequently testify at any trial or hearing contrary to the proffer, or present a position contrary to the proffer through witness testimony or through written or oral argument by counsel."

The memorandum from the proffer session contains some exculpatory information, including the involvement of attorneys from Reed Smith in the formation of Avanti, and a statement by Prence that they would not have gotten attorneys involved if Avanti were Trombetta's corporation.   However, according to the IRS special agent who drafted the memorandum, Prence also made certain statements that could be used to inculpate Trombetta.

Among other things, the memorandum states that Prence was involved in the formation of Avanti; Trombetta attended Avanti meetings and was involved in the management of AMG; Trombetta directed that Avanti make monthly payments to Prence, and Prence then made certain payments to Trombetta that were not reported on Trombetta's tax return; and Trombetta could get anything he wanted just by asking [Avanti shareholder] Geibel.

As with the memorandum of the July 12, 2012 interview, the memorandum of the May 9, 2013 proffer session is replete with references to Trombetta.  Trombetta's name is mentioned *70 times* in the six-page memorandum, and entities that he is alleged to have controlled are mentioned *63 times*.

5

## ARGUMENT

Rule 14 provides, in relevant part: "If … a consolidation for trial appears to prejudice a defendant or the government, the court may … sever the defendants' trials, or provide any other relief that justice requires."  Fed. R. Crim. P. 14(a).

Courts must take great care that the "economy and efficiency" that may be achieved by a joint trial are "achieved without substantial prejudice to the right of the defendants to a fair trial." *Bruton v. United States*, 391 U.S. 123, 131, n.6 (1968) (citations omitted).  Where "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence," a court should sever the defendants for trial.  *Zafiro v. United States*, 506 U.S. 534, 539 (1993).

Because a joint trial here would violate Trombetta's rights under the Confrontation Clause and prevent the jury from properly evaluating the evidence and making a reliable determination about his individual guilt or innocence, Trombetta's trial should be severed.

A.     **Clear Supreme Court and Third Circuit Precedent Hold That Admission of Inculpatory Co-Defendant Statements Violate a Defendant's Rights Under the Confrontation Clause.**

In *United States v. Bruton*, the Supreme Court held that a defendant's constitutional right under the Confrontation Clause is violated when an extrajudicial statement from a non-testifying co-defendant that inculpates the defendant is introduced at a joint trial, even if the jury is instructed that the statement may only be considered as evidence against the co-defendant.

As the Supreme Court explained:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.  Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accuses side-by-side with

6

>    the defendant, are deliberately spread before the jury in a joint
>    trial.

*Id.* at 135 (internal citation omitted).   "The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination."  *Id.* at 136.  Accordingly, "[i]n the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination.  The effect is the same as if there had been no instruction at all."  *Id.* at 137.

The Supreme Court further explained that redaction of the defendant's name from the co-defendant's extrajudicial statements does not cure the *Bruton* problem.  In *Gray v. Maryland*, 523 U.S. 185 (1998), the government had substituted the word "deleted" or "deletion" for the defendant's name in the co-defendant's extrajudicial statement.   The Court held that the statement fell within the class of statements to which *Bruton* applies.  The Court reasoned that:

>    Redactions that simply replace a name with an obvious blank space
>    or a word such as 'deleted' or a symbol or other similarly obvious
>    indications of alteration, however, leave statements that,
>    considered as a class, so closely resemble Bruton's unredacted
>    statements that, in our view, the law must require the same result.

*Id.* at 192.  The Court observed that a jury will frequently react the same to an unredacted statement and a statement redacted in the *Gray* manner since the jury could easily ascertain that the statement refers to the defendant.  *Id.* at 193.  A juror "need only lift his eyes to [the co-defendant], sitting at counsel table" to determine to whom the redaction refers.  *Id.* at 193.[4] Accordingly, presentation at trial of incriminating statements by the co-defendant in *Gray*, which implicated the defendant even when redacted, violated the defendant's right under the Confrontation Clause.  *Id.* at 195.

---

[4] The Court distinguished the statement in *Gray* from a co-defendant's confession in *Richardson v. Marsh*, 481 U.S. 200 (1987), that had been redacted to eliminate not only the defendant's name "but any reference to his or her existence" and became incriminating "only when linked with evidence later introduced at trial."  *Gray*, 523 U.S. at 191.

On multiple occasions, the Third Circuit has applied the *Bruton* line of cases to find violations of a defendant's Confrontation Clause right resulting from the admission at trial of a non-testifying defendant's redacted statement that incriminated another defendant.

In *United States v. Richards*, 241 F.3d 335, 341 (3d Cir. 2001), the government introduced an extrajudicial statement from a defendant that he planned the robbery at issue with a "friend." *Id.* at 341. The government then elicited testimony that the defendant and co-defendant were friends. The Third Circuit held that the reference to the defendant's "friend" was "just as blatant and incriminating of the co-defendant as the word 'deleted' in the *Gray* case." *Id.* at 341.[5] It concluded that the admission of the statement violated the defendant's Sixth Amendment right to confront witnesses under *Bruton* (but did not reverse the conviction because defense counsel failed to object at trial). *Id.* at 337.

In *United States v. Hardwick*, 544 F.3d 565, 567 (3d Cir. 2008), one defendant had entered into a proffer agreement pursuant to which the government agreed not to use his statements against him at trial in its case-in-chief, provided that his statements could be used if the government needed "to rebut any evidence or arguments offered on [the defendant's] behalf." *Id.* at 569. At trial, the defendant breached the terms of his proffer agreement, and the district court then allowed the government to use a redacted version of the proffer statement that replaced all references to the co-defendants with neutral terms. *Id.* On appeal, the Third Circuit held that introduction of the redacted statement violated the co-defendants' rights under the

---

[5] In *Priester v. Vaughn*, 382 F.3d 394, 399 (3d Cir. 2004), the Third Circuit distinguished *Richards* in finding that substitutions such as "the other guy," "someone," "someone else," "the guy," and "another guy" did not violate the Confrontation Clause when there were "at least fifteen perpetrators in various cars involved in the shooting." The case involved so many perpetrators that "the phrases 'the other guy' or 'another guy' [were] bereft of any innuendo that tied them unavoidably to [the defendant]." *Id.* at 401. That is clearly not the situation here, where Trombetta is the only person other than Prence who is charged and Prence is alleged to have conspired with Trombetta.

Confrontation Clause because the statement referred directly to the co-defendants' existence and the defendant had exercised his right not to testify at trial. *Id.* at 573 .

In *Vazquez v. Wilson*, 550 F.3d 270 (3d Cir. 2008), two individuals, Vazquez and Santiago, were charged with a number of offenses, including first-degree murder, for the death of an individual from a single gunshot wound. *Id*. at 272-73. Santiago was arrested in the aftermath of the shooting, at which time he gave a statement in which he admitted to being present at the time of the shooting. *Id.* at 273. Santiago further stated that Vazquez was the shooter and that he was surprised when Vazquez opened fire. *Id.* At trial, Vazquez testified that he was not the shooter, while Santiago exercised his right not to testify. Over Vazquez's objection, the trial court permitted a redacted version of Santiago's statement to be read to the jury substituting "my boy" or "the other guy" for the names of Vazquez and another person, Rivera. *Id.* at 274. Vazquez was ultimately convicted of first-degree murder and other charges; Santiago was acquitted on all counts. *Id.* at 275.

The *Vazquez* Court synthesized the Third Circuit precedent applying *Bruton* as follows:

> [T]he teaching of these cases dealing with the extrinsic evidence issue culminating in *Hardwick* may be that there can be a *Bruton* violation in either of two situations. The first basis for a violation would be if the trial court erroneously admitted into evidence or allowed the use at trial of a statement that on its face incriminated the objecting defendant. The second basis for a violation would be if the court admitted into evidence or allowed the use at trial of a statement that became incriminating when linked with other evidence in the case.

*Id*. at 279.

Under either approach, the Third Circuit noted that there was a *Bruton* violation in *Vazquez*. Specifically, the Court found that since there "were only two possible shooters under Santiago's statement," the jury was "almost certain to conclude that the individual Santiago described in his redacted statement as 'my boy' or 'the other guy' as the shooter was Vazquez

because Rivera was not on trial and the Commonwealth argued that Vazquez fired the fatal shot." *Id.* at 281.  Accordingly, the Third Circuit held that Vazquez was entitled to *habeas corpus* relief pursuant to 28 U.S.C. § 2254.

**B.      Severance Is Required Unless the Government Disavows Any Use of Prence's Statements.**

There can be little doubt that Prence's statements directly raise *Bruton* concerns.  They are incriminating to Trombetta, as they provide evidence that the government could use to support several of the allegations set out above.  Moreover, Prence's statements, which are replete with references to Trombetta and entities that he is alleged to have controlled, cannot be redacted to eliminate the *Bruton* issue.  Indeed, there are *247 such references* in the two memoranda.  Trombetta was the focus of both the government's initial interview of Prence and its subsequent proffer session with him.  That is clear not only from the number of references but also from the entire tenor of the interviews.  Moreover, Trombetta is the only individual other than Prence who is charged.  As Supreme Court explained in *Gray*, a juror "need only lift his eyes to [the co-defendant], sitting at counsel table" to determine that the redactions relate to Trombetta. 523 U.S. at 193.  No amount of redaction can cure that problem.

The Court should not wait for trial to address the *Bruton* issue.  It is in the interest of judicial economy and avoiding a potential mistrial that the Court do so now, just as other district courts in this Circuit facing similar situations have done.

In *United States v. McLaughlin*, No. 3:CR-12-0179, 2013 WL 996266 (M.D. Pa. Mar. 13, 2013), defendant McLaughlin moved prior to trial for severance based on the information that his co-defendant, Williams, had provided to the FBI pursuant to a proffer agreement.  The government argued that it would be premature for the court to order severance until it became clear whether the proffer statement would be admissible against Williams at trial.  The court

rejected the government's position, finding that the *Bruton* issue was ripe and required severance.

> While it is not certain at this time that the Government will attempt to introduce the statement at trial, it is reasonably foreseeable that developments at trial, coupled with the terms of the proffer agreement, will result in the government seeking to introduce William's statement, as the agreement provides that the Government can introduce the statement if it makes a "good faith determination" that Williams was not truthful, or withheld material evidence, or if evidence offered on Williams' behalf is materially inconsistent with his prior statement.

> Moreover, waiting to resolve the severance motion until Williams' trial strategy becomes apparent could undermine the benefits of judicial economy joint trials are meant to protect. . . .

> If resolution of McLaughlin's request for severance is reserved until Williams' arguments and theory of his defense are apparent at trial, the principle of judicial economy on which the joinder rules are based would be compromised.  That is, since admission of the statement at a joint trial would implicate McLaughlin's Sixth Amendment rights absent a decision by Williams to testify at trial, which would likely result in McLaughlin seeking a mistrial, reserving judgment on the severance request until trial would frustrate the goal of joint of avoiding the unnecessary use of judicial resources.

*Id.* at * 9.

In *United States v. Singleton*, Crim. No. 11-76, 2012 WL 568715 (E.D. Pa. Feb. 22, 2012), both defendants had given proffers subsequent to arrest and moved for severance prior to trial, arguing that they would be prejudiced by the information contained in each other's proffers. Based on *Bruton*, *Gray* and *Richardson*, the court granted the pre-trial motion for severance.  In doing so, it rejected the government's proposal to use redacted statements because "there is a serious risk that a joint trial will compromise [the defendant's] Sixth Amendment right of confrontation because a joint trial will make it difficult for the a jury to reliably judge guilt or innocence."  *Id.* at * 2.

11

While the government has not produced Prence's proffer agreement, the standard proffer agreement in this district uses language similar to the language that the court considered in *McLaughlin*.  As in *McLaughlin*, it is "reasonably foreseeable that developments at trial, coupled with the terms of the proffer agreement," will result in the government seeking to introduce Prence's statement.  *McLaughlin*, 2013 WL 996266 at * 9.  Furthermore, unlike in *McLaughlin*, Prence gave an additional statement that is not covered by his proffer letter, making the government's use of that statement even more predictable.  Accordingly, since admission of either statement at a joint trial would implicate Trombetta's Confrontation Clause rights absent a decision by Prence to testify at trial (which would likely result in Trombetta seeking a mistrial), "reserving judgment on the severance request until trial would frustrate the goal of joint of avoiding the unnecessary use of judicial resources."  *Id.*

**CONCLUSION**

For the foregoing reasons, Trombetta respectfully requests that his motion be granted. Unless the government commits that it will not make any use of Prence's statements in a joint trial and the Court so orders, the trial of the charges against Trombetta should be severed from the trial of the charges against Prence, and it is in the interests of judicial economy that the Court do so now.

Respectfully submitted,

s/ Robert A. Salerno
Adam S. Hoffinger, DC 431711
Robert A. Salerno, DC 430464
Schulte Roth & Zabel LLP
1152 15th Street, N.W.
Washington, D.C.  20005
Telephone: (202) 720-7470
Facsimile: (202) 730-4520
adam.hoffinger@srz.com
robert.salerno@srz.com

*Counsel for Defendant Nicholas Trombetta*

13

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | No. 2:13-cr-00227-JFC-1 |
| v. | ) | |
| | ) | |
| NICHOLAS TROMBETTA, | ) | |
| | ) | Judge Joy Flowers Conti |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I, Robert A. Salerno, counsel for Defendant Nicholas Trombetta, hereby certify that I caused a copy of the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which shall send notification of such filing to all parties of record.

s/ Robert A. Salerno
Robert A. Salerno
*Counsel for Defendant Nicholas Trombetta*

Dated:  July 13, 2015